# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WTW ENTERPRISES, LLC et al., <br><br> Plaintiffs, <br><br> v. <br><br> MARINE GROUP BOAT WORKS, LLC, et al., <br><br> Defendants. | Case No.: 18-CV-0140 W (MSB) <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. 33]** |

Pending before the Court is a motion for summary judgment filed by Defendant Marine Group Boat Works, LLC, and joined by Defendants FM Marine Group, Inc. and Francisco Magana. [Docs. 33, 36.] Plaintiffs WTW Enterprises, LLC, Argonaut Insurance Company, and B&M Sportfishing, Inc. oppose. [Doc. 42.] The Court decides the matter on the papers submitted without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons discussed below, the Court **DENIES** the motion.

//
//
//
//
//

1

## I. BACKGROUND

On or about October 6, 2016, Argonaut Insurance Company ("Argonaut") issued policy no. KDH-1099-W16 to WTW Enterprises LLC ("WTW"), providing WTW's commercial sportfishing vessel *M/V Malihini* with maritime Hull & Machinery and Protection & Indemnity insurance for the policy period October 5, 2016 to October 5, 2017. (*Revised Joint Statement of Disputed and Undisputed Facts ("JSDUF")* [Doc. 46] ¶ 1.) This policy also covered the related entity B&M Sportfishing, Inc. ("B&M"). (*Id.*) That policy granted WTW the privilege to waive subrogation. (*JSDUF* [Doc. 46] ¶ 2[1].)

The *Malihini* is a 72.5-foot double-planked wood sportfisher built by Higgins Marine of New Orleans, Louisiana. (*Pacific Rim Surveyors Report* [Doc. 42-12] 10.) The craft was originally built as a PT boat, but it never saw military service. (*Id.*) Instead, it was surplused when World War II ended. (*See id.*) It became a yacht, then a sportfishing vessel based out of San Diego. (*Id.*) It is certified for 51 passengers and 3 to 6 crew. Mr. Wilkerson, CEO of WTW, bought the *Malihini* in 2006. (*Wilkerson Decl.* [Doc. 42-7] ¶ 1.) The vessel is now owned by WTW and operated by B&M. (*Id.* [Doc. 42-7] ¶ 3.)

In or around May of 2017, the *Malihini* struck a submerged object, believed to be a whale. (*JSDUF* [Doc. 46] ¶ 3; *Wilkerson Decl.* [Doc. 42-7] ¶ 3.) Per U.S. Coast Guard instructions, the vessel was hauled to Marine Group Boat Works, LLC ("Marine Group"), a Chula Vista boatyard. (*JSDUF* [Doc. 46] ¶¶ 5–6; *Wilkerson Decl.* [Doc. 42-7] ¶ 4.) Mr. Wilkerson signed a work order, labeled "Contract," in order to haul out the *Malihini* to Marine Group. (*Contract* [Doc. 28-1, Exh. A].) Among a full page of fine print, that contract contained an assumption of risk and a subrogation waiver. (*Id.* [Doc. 28-1, Exh. A] § 8.) The waiver stated:

//

---

[1] Unless otherwise noted, all objections are overruled.

> Owner, having assumed the risk of loss, shall purchase and maintain such types and amounts of insurance as owner deems reasonable and prudent to fully insure the vessel and to protect against risks of loss, including the risks assumed by owner under this contract. Owner agrees to look only to such insurance in the event of any loss irrespective of legal responsibility for such loss. As to all such policies of insurance and all claims made thereon, owner, for itself, and on behalf of owner's insurers, specifically waives all right of subrogation against contractor, its subsidiaries, affiliates, agents, officers, directors and employees.

(*Id.* [Doc. 28-1, Exh. A] § 8(B).) This waiver further stated:

> Nothing herein is intended to or may be construed to relieve contractor of liability for loss or damage caused by its gross negligence or willful misconduct.

(*See id.* [Doc. 28-1, Exh. A] § 8(F).)

Marine Group selected carpenter Francisco Magana to repair the *Malihini*. (*See JSDUF* [Doc. 46] ¶ 46.) Mr. Magana is a subcontractor who has worked with Marine Group for some time but who has never been an employee. (*JSDUF* [Doc. 46] ¶¶ 47, 49.) Magana admitted in deposition that this was project was the first double-planked wooden hull he had ever worked on, and that he does not understand the double-planked system. (*Id.* [Doc. 46] ¶ 51.) Marine Group Project Manager Brooks Detchon chose Mr. Magana for the project despite lacking any information about his training. (*Id.* [Doc. 46] ¶¶ 46, 50.)

The *Malihini* spent two months at the Marine Group boatyard. (*JSDUF* [Doc. 46] ¶ 56.) Afterwards, the boat was launched into the water on July 21, 2017. (*Id.* [Doc. 46] ¶ 64.) The boat immediately began taking on water. (*See id.* [Doc. 46] ¶ 65.[2])

---

[2] Defendant objects to the fact that the boat began leaking after repairs as "irrelevant." (*JSDUF* [Doc. 46] ¶ 65.)

Wilkerson and his crew made their best efforts to patch the leaks without the assistance of Marine Group. (*Id.* [Doc. 46] ¶ 66.) The boat was relaunched on July 24, 2017 and returned to service. (*Id.* [Doc. 46] ¶ 67.) Further problems arose, and Marine Group and Magana performed further work on the *Malihini* in August of 2017. (*See id.* [Doc. 46] ¶¶ 68–91.)

Plaintiffs' expert, marine surveyor David Jackson, identified the following problems in a 2017 inspection:

> The inner planking had gaps where the planking did not go to the chines. At least one butt block had protruding screws. The diagonal inner layer of bottom planking was cut back to the garboards and is short of the chines in places. No bedding compound or cloth was used in between the plank layers. The inner and outer layer planking lacked proper backfastening. Improper bolting was used in the bottom frames. An improper plank butt schedule was used, as well as insufficient butt blocks. There are many replacement planks that are too short. The forward lower chine guard fell off after the vessel was re-launched. Port shaft and struts were not properly aligned, and the port shaft coupling bolts were only hand tight.

(*JSDUF* [Doc. 46] ¶ 78 (quoting *Jackson Decl.* [Doc. 42-10] ¶ 4).[3]) Also, Marine Group moved the *Malihini* on a device called a travel lift while there were planks missing from its hull—a process that exposed the hull to a risk of distortion. (*JSDUF* [Doc. 46] ¶¶ 80–91; *Jackson Decl.* [Doc. 42–10] ¶ 5.) Ultimately, Plaintiffs brought the ship to another party to have it successfully repaired. (*See JSDUF* [Doc. 46] ¶ 14.)

Argonaut has paid a total of $506,205.63 on this claim—$121,740.60 for the work done by Marine Group, and $384,465.03 in order to bring the ship back to working order after Marine Group finished with it. (*JSDUF* [Doc. 46] ¶ 14.)

---

[3] Defendant produces no evidence to refute these facts offered by Plaintiffs. Once again, it objects on relevance grounds. (*JSDUF* [Doc. 46] ¶ 78.) The objection is overruled.

4

Defendants filed this motion for summary judgment on December 18, 2018, seeking to enforce the subrogation waiver on the WTW work order's reverse side. (*Defs.' MSJ* [Doc. 33].) Plaintiffs oppose. [Doc. 42.] For the reasons that follow, the motion will be denied.

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 when the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this "burden of production" in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. See id. at 322–25; Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000) (explaining relevant burden-shifting terminology). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the Court is not obligated "to scour the record in search of a genuine

5

issue of triable fact . . . ." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden of production on the motion, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. Anderson, 477 U.S. at 255.

### III. DISCUSSION

#### A. Applicable Law

" 'With admiralty jurisdiction,' we have often said, 'comes the application of substantive admiralty law.' " Yamaha Motor Corp., U.S.A. v. Calhoun, 516 U.S. 199, 206 (1996) (quoting East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986)). "The exercise of admiralty jurisdiction, however, 'does not result in automatic displacement of state law.' " Id. (quoting Jerome B. Grubhart, Inc. v. Great Lakes Dredge & Dock. Co., 513 U.S. 527, 545 (1995)).

"When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 22–

6

18-CV-0140 W (MSB)

23 (2004). "Basic principles in the common law of contracts readily apply in the maritime context." Clevo Co. v. Hecny Transp., Inc., 715 F.3d 1189, 1194 (9th Cir. 2013); see, e.g., Bear, LLC v. Marine Grp. Boat Works, LLC, No. 14-CV-2960 BTM (BLM), 2017 WL 1807650, at *3 (S.D. Cal. May 5, 2017) (Moskowitz, J.). The Court " 'look[s] to the common law in considering maritime torts.' " See, e.g., Royal Ins. Co. of Am. v. Sw. Marine, 194 F.3d 1009, 1015 (9th Cir. 1999) (quoting Su v. M/V S. Aster, 978 F.2d 462, 472 (9th Cir. 1992)).

### B. The Subrogation Waiver is Not Effective as to Gross Negligence or Willful Misconduct.

The subrogation waiver in question states: "[n]othing herein is intended to or may be construed to relieve contractor of liability for loss or damage caused by its gross negligence or willful misconduct." (*Contract* [Doc. 28-1, Exh. A] § 8(F).)[4]

The subrogation waiver is ineffective as to any of Argonaut's claims "for loss or damage caused by [Marine Group's] gross negligence or willful misconduct." (*Contract* [Doc. 28-1, Exh. A] § 8(F).) Thus, the issue becomes whether Defendant has demonstrated the absence of a genuine dispute that Argonaut's damages were not caused by Marine Group's gross negligence or willful misconduct. As follows, it has not.

### C. Defendant Does Not Demonstrate that Argonaut's Damages Were Not Caused by Gross Negligence or Willful Misconduct.

As the moving party on a motion for summary judgment based on the subrogation waiver, Defendant must demonstrate the absence of a genuine dispute of material fact

---

[4] Furthermore, Ninth Circuit law is clear that subrogation waivers in maritime contracts are not effective as to either gross negligence or intentional misconduct. Royal Ins. Co. of Am., 194 F.3d at 1015, 1016 n.8. The Court need not and does not apply this point of law, as the motion is decided on the language of the contract.

7

that Argonaut's damages were not caused by gross negligence or willful misconduct. (*Contract* [Doc. 28-1, Exh. A] § 8(F).) See Fed. R. Civ. P. 56; Celotex, 477 U.S. at 323.

As discussed in Part III.A., *supra*, the Court " 'look[s] to the common law in considering maritime torts.' " Royal Ins. Co. of Am., 194 F.3d at 1015 (quoting Su, 978 F.2d at 472). "California law defines 'gross negligence' as 'the want of even scant care or an extreme departure from the ordinary standard of conduct.' " Id. (quoting Kearl v. Board of Med. Quality Assurance, 189 Cal. App. 3d 1040, 1052 (1986)). "Black's Law Dictionary defines 'gross negligence' as '[t]he intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.' " Id. (quoting BLACK'S LAW DICTIONARY 1185 (4th ed. 1968)). Gross negligence "is simply a 'point . . . on a continuum of probability.' " Id. (quoting Vision Air Flight Serv. Inc. v. M/V Nat'l Pride, 155 F.3d 1165, 1176 n.13 (9th Cir. 1998)). "Its presence 'depends on the particular circumstance of each case.' " Id. (quoting Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 411 (5th Cir. 1982)).

The same set of facts underlies all claims for relief in the FAC. (*FAC* [Doc. 28].) Marine Group selected a carpenter who had no experience with this kind of work. (*See JSDUF* [Doc. 46] ¶¶ 50–51.) It did not effectively supervise him. (*See id.* [Doc. 46] ¶¶ 53–54.) The ship immediately took on water upon launch. (*See id.* [Doc. 46] ¶ 65.) Plaintiffs' expert report reveals numerous problems with the work and characterizes it as an "extreme departure from the ordinary standard of care." (*Id.* [Doc. 46] ¶¶ 78–79.) Defendant offers no evidence to the contrary. (*Id.*) It does not show that any of Argonaut's damages were caused by any other source. A genuine dispute remains as to whether Argonaut's damages were caused by gross negligence or willful misconduct.[5] (*Contract* [Doc. 28-1, Exh. A] § 8(F).)

---

[5] The motion does not discuss the meaning of "willful misconduct" as used in the contract, or how that term might apply here.

8

18-CV-0140 W (MSB)

Defendant does not meet its initial burden of production on the motion. (*Defs.' Mot.* [Doc. 33].) See Fed. R. Civ. P. 56; Celotex, 477 U.S. at 323.

The motion will be denied.

IV. **CONCLUSION & ORDER**

For the foregoing reasons, the motion is **DENIED**. [Doc. 33.]

**IT IS SO ORDERED.**

Dated: March 4, 2019

Hon. Thomas J. Whelan
United States District Judge